UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
RACHEL MARKOWITZ,

                Plaintiff,                              **COMPLAINT**

        -against-                          Jury Trial Demanded

PRECIPART CORPORATION,

                Defendant.
----------------------------------------------------------------X

      Plaintiff, Rachel Markowitz, by and through her attorneys, LEEDS BROWN LAW, P.C., complaining of Defendant herein, alleges upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1. This action is brought pursuant to the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.*, and any other cause of action which can be inferred from the facts set forth herein.

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. §1343(a)(3), 28 U.S.C. § 1343(a)(4).

3. Venue is proper pursuant to 28 U.S.C. § 1391.

4. All conditions precedent to maintaining this action have been fulfilled.  On September 5, 2019, a complaint was filed with the New York State Division of Human Rights ("NYSDHR"), which was dual-filed with the Equal Employment Opportunity Commission ("EEOC").  On August 4, 2020, the EEOC issued a right to sue letter.  This action was properly instituted within 90 days of the receipt of said letter.

1

## PARTIES

5.  Plaintiff, Rachel Markowitz ("Rachel") is a working mother.  Rachel  was and still is a resident of Nassau County, New York.

6.  Defendant, Precipart Corporation ("Precipart") is a domestic business corporation with a principal place of business in Farmingdale, New York.  Precipart is engaged in the business of engineering, designing, and manufacturing high precision gears and mechanical components.

## FACTUAL BACKGROUND

7.  On February 29, 2016, Precipart hired Rachel as a Manufacturing Engineer.  During the hiring process, Precipart's maternity leave policy was discussed, which Madeline Matlak (HR Manager) appeared to characterize as family leave benefits.

8.  In July 2016, Rachel suffered an ectopic pregnancy,[1] and was required to abort in an attempt to avoid significant health issues.  Rachel did not miss work, despite suffering great pain.  While at work, a fallopian tube ruptured, and Rachel was rushed to the emergency room.  Rachel lost her right fallopian tube.

9.  On September 14, 2016, Rachel emailed Matlak to further inquire about Precipart's maternity leave policy.  Matlak replied, in substance, that Precipart offered no paid maternity leave beyond its standard short-term disability benefits.  Matlak noted that Precipart was considering enriching its short-term disability plan to provide some paid time off, but that nothing had been finalized.

---

[1] An "ectopic pregnancy" is one that occurs outside the womb, usually in one of the fallopian tubes. Because the fetus cannot survive and the mother could suffer life-threatening internal bleeding, ectopic pregnancies must be terminated at the earliest sign.

10. Rachel later spoke with Matlak in person regarding the apparent discrepancy between their discussion during the hiring process and Matlak's email.  Matlak admitted that she should have better clarified Precipart's policies upon Rachel's hiring, noting that Precipart hires very few young women that are exempt employees. Matlak's only suggestion was that Rachel ask for better benefits when she completed the employee survey that would be distributed in November.

11. Daienna Edmonds (HR Generalist) overheard this conversation, and commented that Rachel should vote for Trump, who had made a campaign promise of paid maternity leave.

12. In October 2016, Rachel began receiving treatment for invitro fertilization ("IVF").  This required her to get periodic bloodwork in the morning, at which times Rachel stayed at work for an extra half-hour to make up the time.  Rachel used her accrued vacation time in half-day increments to attend doctor appointments.

13. Once Rachel had used her accrued vacation time, Precipart required Rachel to take a full unpaid day for each doctor appointment.

14. Rachel complained to her direct supervisor, Daniel Rudolf (Director of Continuous Improvement), told him that she only needed a half-day for her doctor appointments, and that she was losing money as a result.  Rudolf told Rachel that she should have planned her pregnancy in a more financially responsible manner.

15. In October 2016, Rachel spoke with Rudolf regarding Precipart's lack of maternity benefits.  Rudolf told Rachel that it was her choice whether to have children, and that she

would have to choose between children and work.

16. Based on the unreceptive responses regarding maternity leave that Rachel received from

HR and Rudolf, on September 30, 2016, Rachel emailed John Walter (CEO):

> I know you are very busy, so I just wanted to send you a quick email in regards to employee benefits that I have been discussing with HR and Daniel.  I did not feel comfortable leaving this discussion in HR's hands to make you aware of the issue, so I wanted to bring it to your attention.
>
> When I was hired I was unaware of the lack of maternity leave benefits that Precipart has.  Madeline admits that when hiring female employees this is not usually a topic that is mentioned in detail, and she just says that Precipart has family leave benefits. Not realizing that this was just a state right, that I can file for 'short term' disability at $34 a day for 6 weeks, and that Precipart has no actual maternity leave benefits.
>
> When discussing this with HR, I was told many things; vote for trump, fill out the employee survey come November, etc.  I do not feel comfortable leaving this subject as a dead issue, where it will be swept under the rug and forgotten about because there are not many other young women of child bearing age in this company. Nor do I feel waiting for a November survey is a sufficient answer, where odds are I will be the only employee making this request.
>
> Like I said, I just wanted to make you aware of this situation and if you would like to speak with me further, I would be happy to do so.  I love working for Precipart, and I could not be more happy doing the work that I do, with the team that I have.

17. Walter did not respond to this email.

18. A few days later, Rachel visited Walter's office to follow-up.  Walter said, "Tough luck,

if you can't afford to have children then don't."  Thereafter, Rudolf chastised Rachel for

"going above his head" and attempting to address the maternity leave issue with Walter.

19. In the following months, Rachel made various inquiries with insurers regarding maternity

leave benefits.

20. Rachel was advised by Aflac that Precipart would need to initiate the policy itself and would need five employees to sign up.  In light of Matlak's prior representation that Precipart was considering enriching its short-term disability plan, Rachel shared this information with HR.

21. Michele Pisani (Director of HR) rejected the idea, and further rejected the idea of expanding the policy outside the context of short-term disability, as she felt it would be abused.

22. In early 2017, Harry Vasudev (Continuous Improvement Department Lead) was reassigned from the Continuous Improvement Department ("CID") to Quality Control ("QC").

23. Due to purported budgetary constraints during a period of rapid expansion, Rachel assumed most of Vasudev's prior CID duties, in addition to her existing duties.

24. In early 2017, Andrew Pandis (Vice President – Business Development) told Rachel that it was a shame that Rachel was having a child, as that meant she would not be able to grow her career at Precipart.

25. A few weeks later, Pandis told Rachel that she must have a strong husband to allow her to work while having a family.

26. In May 2017, in apparent response to the pregnancy of Anna Ferrizz (Project Manager) and Rachel's inquiries regarding maternity leave, Walter instructed Pandis and David

Roth (Director of Sales and Marketing) not to hire any women.  This was witnessed by Anna Ferrizz.

27. Thereafter, in accordance with Walter's instructions, Roth hired two male sales engineers in June 2017 (Jonathan Bellon[2] and Matthew Levine).

28. In May 2017, Kathy Haley (Senior Manager) told Rachel that she had made a discrimination complaint in the 90s against her manager, who was the son of Precipart's then-CEO; shortly thereafter, Haley's tires were slashed, which she believed was done by the son of the then-CEO in retaliation for her complaints.

29. In July 2017, Rachel received her annual performance review.

30. Rachel was penalized in the attendance section of this review, which specifically noted her absences were related to an "understandable" "medical issue."

31. The review was otherwise positive, and Rachel was praised for taking on Vasudev's CID duties and other duties; however Rachel was not promoted.

32. This, despite the fact Precipart had previously promoted male employees[3] who had assumed the duties of others.  Examples include:

    a. Ryan Kubik – Hired June 12, 2017 as Planner, promoted to promoted to Project Engineer on August 6, 2018;

    b. Jean Tapia – Hired March 27, 2017 as Associate Production Planner, promoted to Production Planner on August 6, 2018;

---

[2] Bellon later quit on April 6, 2019 and was replaced by another male engineer, Frank Ramos.

[3] Notably, nearly all members of upper and middle management are male.

    c.  Michael Wlaszynowicz – Hired March 13, 2017 as Manufacturing Quality Engineer, promoted to Lead Person, Inspector on August 6, 2018; and

    d.  Dung Lam – Hired 2002 as Senior Project Engineer, promoted to Manager Engineer on July 23, 2018.

33. In July 2017, Ferrizz gave birth.  Ferrizz advised Rachel that when she told HR that she intended to take 12 weeks of maternity leave, she was met with looks of disgust.

34. In late 2017, Ferrizz returned from maternity leave. Ferrizz told Rachel that Pandis told Ferrizz that it was a shame that Ferrizz had a baby, as that would stifle her growth at Precipart.

35. In February 2018, Rachel received another performance review.  Although the review was positive, resulting in a small bonus, Rachel was again not promoted.

36. On March 5, 2018, Vasudev was officially promoted to QC Manager.  As a result, Rachel (who was performing most of the CID duties Vasudev previously performed), now performed all of Vasudev's former duties.  Although Rachel was now performing two jobs, and Precipart made several new hires during this period, Precipart did not hire someone to assume Vasudev's former duties.

37. In April 2018, in response to several complaints from Rudolf and others about Rachel leaving work to attend doctor appointments, and the financial burden imposed by Precipart's requirement that she unnecessarily take full unpaid days to attend such appointments, Rachel ceased IVF treatment.

38. In June 2018, Rachel unexpectedly became pregnant naturally.

39. In July 2018, Rachel received another performance review.

40. Rachel was again penalized in the attendance section of this review, with the narrative portion of that section stating, "absences were understandable due to the circumstances (i.e. her pregnancy).

41. The review was otherwise positive, resulting in a small bonus.

42. However, Rachel was again not promoted.

43. During this period, several male employees within Rachel's business unit who were hired after Rachel were promoted, including Ryan Kubik (hired spring 2017 as Production Planning Engineer, promoted to Project Engineer), Jean Tapia (hired March 27, 2017 as Associate Production Planner, promoted to Production Planner), and Michael Wlaszynowicz hired March 13, 2017 as Manufacturing Quality Engineer, promoted to Lead Person Inspector).

44. On December 10, 2018, in response to Rachel's impending maternity leave, Rudolf opted to hire a replacement for Vasudev's former position, the duties of which Rachel was currently performing. This, despite the fact Precipart previously claimed it did not have the budget to make such a hire.

45. Rudolf hired a male for this position (Cameron Thompson).

46. In early 2019, in relation to Rachel's impending maternity leave, on several occasions Rudolf made comments to the effect that if Rachel was going to be out for so long and not missed, there would be no reason to bring her back. These remarks were witnessed by

Edward Conway (Continuous Improvement Coordinator), Eric Fredriksen (Senior Manufacturing Engineer), Patrick Scott (Manufacturing Engineer), Lennard Bactawar (Quality Assurance Engineer), and others.

47. In early 2019, Rudolf discussed getting tablet computers for Rachel's department. Robert Field (Director, Global Digital Solutions) asked Rachel how long she intended to take maternity leave, to which Rachel replied eight weeks.[4]  Field scoffed, stating it was pointless to give Rachel a tablet when Rudolf would receive no productivity from Rachel while she was on leave.

48. When Rachel returned from leave, she was required to use her own personal phone and data plan (without reimbursement) to share information that otherwise would have been conveyed via tablet, which impeded productivity.

49. In February 2019, Rachel received another performance review.  Although the review was positive, resulting in a small bonus, Rachel was again not promoted.

50. On February 8, 2019, Rachel went into labor while at work, delivering a baby girl the following morning.

51. On March 18, 2019, while Rachel was on maternity leave, Rudolf hired Evan Perrino as a Manufacturing Engineer.  Perrino was assigned to perform job duties that were substantially similar to Rachel's, at a substantially similar pay rate.  Notably, unlike Rachel, Perrino does not have a master's degree or Six Sigma Greenbelt Certification, and is significantly less experienced.

---

[4] A typical maternity leave is longer than this – based on Rudolf's comments about not having a reason to bring her back, Rachel decided to only take eight weeks.

52. On April 29, 2019, Rachel returned to work.

53. In May and June 2019, in relation to a 20-week paternity leave that Rachel's husband had taken, Rudolf made repeated remarks to the effect of, "he is going to forget his job while on leave," and "why should his company take him back after so long?"  These comments were witnessed by Perrino, Conway, Fredriksen, Scott, Bactawar, and others.

54. In June 2019, Rachel asked Rudolf about the possibility of promotion.  Rudolf said he would look into it, but quickly changed the subject.

55. In June 2019, Oliver Laubscher was promoted to Global CEO, and began having one-on-one meetings with employees to discuss how to improve the company.  HR initially refused Rachel's request to meet with Laubscher, but relented once it became apparent Rachel knew HR had scheduled many other employee meetings with Laubscher.

56. On June 12, 2019, Rachel met with Laubscher, wherein she discussed the negative responses she received in response to pregnancy and maternity leave, and the fact Precipart offered no maternity benefits.

57. After the meeting, Rachel followed up by email, stating:

> I just wanted to thank you for taking an hour out of your busy schedule to accommodate and truly listen to me, I feel honored.  It took a lot of contemplating on my end, weighing the negatives and positives that could come from our meeting.  I know a current employee, that will go unnamed, that is experiencing trouble conceiving.  She is afraid of the repercussions and highly unprofessional comments I received through the years.  Her family planning is now on hold, not wanting to experience what I have. And that's just the tip of the iceberg.

58. That evening, Laubscher replied to this email as follows:

> Thank you Rachel for your time and input today.
>
> Reading your note and hearing your feedback today was hard.  I'm very proud about Precipart in general but today I questioned certain aspects and recognized we need to do more in the areas you addressed.
>
> I thank you profoundly for helping me identify the areas we need to improve.  You being brave and courageous is a testament to you…but it shouldn't be hard for anyone wanting to improve the company and nobody should go through these emotions when doing so.
>
> Am sorry and I will do my best to change some of the cultural challenges we have.  You'll see changes around benefits around family leave soon as we put them into works.
>
> This won't hurt your job or future at Precipart.  I wouldn't allow that to happen.  Could you please outline the financial impact you had in more detail?
>
> Am always here to chat and appreciate your continuous feedback and ideas to make us better for families and everyone here.
>
> Best wishes.

59. Rachel replied to Laubscher that same evening, including a breakdown of the financial impact she sustained.  Rachel noted that she did not take all of the time that she could have, as she feared it would stunt her growth at Precipart, in addition to causing further financial hardship.

60. On June 14, 2019, Laubscher attended a breakfast meeting to discuss issues faced by Precipart's younger employees.  Present at this meeting were Ferrizz, Vasudev, Chris Brandeker (Manufacturing Engineer), Maria Broadway (Manager of Group Marketing and Communication), and Cassandra Tyler (IT Professional).  Among other things, the

following issues were raised during this meeting:

    a.   Walter's May 2017 directive that Precipart not hire any more women;

    b.   The lack of women in Precipart's senior management and salaried positions;

    c.   Unfair stigmas placed on working mothers at Precipart, while working fathers went uncriticized for altering their schedule to attend to childcare issues;

    d.   The fact maternity leave was looked down upon by Precipart, while leave taken by male employees for health reasons was uncriticized.

61. Although Laubscher appeared receptive to these complaints, upon information and belief, he never followed up on any of them.

62. In mid-June 2019, Rachel met with Edmonds to discuss the procedure for her to request a promotion.  Edmonds told Rachel to print out her job description, and discuss with Rudolf what she had accomplished, as well as the goals she had set and reached. Edmonds asked Rachel to report back after Rachel met with Rudolf; Rachel agreed.

63. In late June 2019, Rachel mentioned Walter's directive that Precipart not hire any more women to Rudolf.  Rudolf admitted it was true, and said that when he was going through the hiring process that led to the hiring of Cameron and Evans, HR asked him if he would prefer that they eliminate all female applicants so he would not have to go through another employee leaving for maternity leave again.  Rudolf claimed he told HR not to eliminate female applicants from the list, but he never interviewed any females.

64. In late June 2019, Rachel met with Rudolf to discuss a promotion.  Rudolf told Rachel she would probably have to wait a year, as Walter felt Rachel had missed too much work as a result of taking maternity leave and other pregnancy related issues.  Rachel asked if

she could justify her promotion based on her job description, accomplishments and the goals she had set and reached, as HR had suggested.  Rudolf said it was a non-starter but acknowledged that Rachel performed her job well and that he recognizes that Rachel has been performing the duties of a supervisor for a long time.

65. On July 11, 2019, after obtaining Rudolf's permission, Rachel emailed Walter and Georges Assimilalo (COO and VP of Engineering) regarding a negative interaction she had with Pandis that she believed would lead to her and others being falsely blamed for Pandis' mistakes.

66. In this email, Rachel also noted Pandis had made inappropriate comments, which she was willing to speak to HR about.  Walter replied, admonishing Rachel's criticisms of Pandis, and referring the matter to HR.

67. Rachel met with HR later that day.  The substance of this meeting was memorialized in an email by HR as follows:

> Rachel Markowitz Complaint taken on 7/11/19 at 4pm by Michele Pisani and Daienna Edmonds w/Evan present.  She said she came to see us as John said to – so now it will all be told.  Below is Daienna write-up with MP additions.
>
> 1. Rachel said John doesn't want to hire more women.  Rachel said that John said in front of Andrew P, Dave R, Anna F and herself that he didn't wish to hire more women.  This was during the time when PC was looking for 2 Sales Engineers.  As a result, Rachel felt Dave didn't select female candidates and hired 2 males (Jonathan & Matthew).  There was a New Generation Breakfast hosted by Oli.  Invitees included Chris B, Cassie T, Anna F and Maria B.  During this breakfast Rachel said this was shared with Oli.
>
> 2. Rachel said that on several occasions Andrew said to Anna and Rachel "it's a shame you have families (or are mothers) now so you will not be able to grow as individuals in the company."  This was also mentioned at the Breakfast w/Oli.

3.  In a private conversation, Andrew told Rachel that her husband must be strong to let his wife work and be a mother.  No witnesses.

4.  While Rachel was pregnant, Danny told her a story he heard about a man who had an employee that he thought was the most important to him but after he was on a leave of absence for a while, he realized the employee was not that important.  Danny relayed this story to her more than one time.  Her interpretation was that he was telling her that if she was out on maternity leave for a long time and ended up being not missed, then why would we need her and therefore he might not need her if she took too much time off for the baby.  Rachel said Danny said it in the open where others that sit by her like Evan, Ed, Erik, Pat, or Lennard would have heard it.

5.  She said a couple of years back she went to have a one on one conversation with John Walter regarding maternity leave since we did not have any paid maternity leave or STD.  During this meeting, Rachel said John discussed his stepdaughters situation and said, "If you can't afford to have children then don't.

6.  Rachel said Andrew used to be responsible for Facilities but it was taken away from him since he was on the road so much.  It was given, as a shared responsibility, to Danny R and Joe B.  With Joe B.'s recent health issues to lighten his load, CI was asked to help design a floor layout.  Rachel said she worked well with Gene to accommodate the different department needs.  Gene, Rachel, Danny, John, and Georges met to discuss space.  During this meeting John called Andrew to come in so that he could ask him about a machine.  After that Andrew took it upon himself to take control of the project and basically pushed everyone else aside.  She said he was a disaster and made a mess of it.  Andrew planned meetings when he was going to be traveling.  He would come in when no one else was around then not communicate what he did.  Recently John told them to clear out the old Assembly room and items were still not moved out that needed to be.  Today, to protect herself, Rachel sent an email to John and Georges with an update since she said Andrew was going to throw her and others under the bus.  Rachel said Gene will verify everything she said in the email and she even copied Danny before sending it out.

7.  Rachel took offense to John's response to her email where he references her being removed from most customer communications other than PPAP and defending Andrew due to English being his second language.  Rachel said she and others in CI heavily support Andrew and all his jobs since he is such a disaster.  CI has to support sales heavily with having phone calls with customers when he is not around.  She believes CI is not saving as

much as they could because they are working Andrew's sales job and not
CI work.

8. Rachel said Andrew just pissed off Medtronic's so bad that they called
Robert M and today Andrew and Meghan K were traveling there but
Andrew refused to travel with Laura and Mass who were going separately
from PC.

9. Rachel says John protects certain people like Andrew and Sanish T. and
Turns a blind eye when it comes to them.

She was very upset and concerned over her future employment.  She really enjoys
her job and coworkers but she fears this will come back to her negatively
especially when it comes to being promoted and bonuses.  Michele and I both
reassured her that there would be no retaliation and that we would conduct a
formal investigation after reviewing this with Rich Fox.  In Lieu of the recording
she wanted, we agreed to provide her and Evan with a copy of this write up.

68. On July 15, 2019, based on firm-wide email sent by Laubscher regarding the
implementation of a flex schedule that could be used to attend to childcare issues, and
consistent with protocol, Rachel emailed her department to notify them that she was
leaving work early to attend to a school related issue for her son.

69. The next day, Rachel was advised by Scott that Walter was livid that she had left early.
Rachel emailed Walter, indicating that she heard he was looking for her the previous day,
and that she had left early and had followed flex-time protocol.  Walter did not respond.
Similarly situated males who utilized flex time are never treated in this manner.

70. On July 17, 2019, Rachel was summoned to a meeting with Pisani, and was asked
whether she had any additional concerns that Pisani should be aware of.  Rachel advised
Pisani of the following:

a. In September 2016, Rudolf was dismissive to Rachel's concerns regarding
Precipart's maternity leave policy, so Rachel emailed Walter directly to discuss
same. Rudolf was angered by this, and treated her poorly thereafter.

b. Rachel always received excellent reviews and had assumed greater duties, but was repeatedly turned down for promotion and meaningful raises, and felt that taking maternity leave was the cause based on, *inter alia*, negative comments made by Rudolf, Walter, and others.  Similarly situated male employees, including male employees hired after Rachel, had taken time off for medical and other reasons, which did not affect their promotions.

c. Walter was angered by the fact Rachel took flex-time on July 15, 2019, and acted as if Rachel had done something wrong for doing so.  Pisani assured Rachel that taking flex time was permissible.  Rachel told Pisani that although she and Laubscher may approve of flex-time, it was apparent that Rudolf and Walter were against it, and they were the persons most responsible for determining her salary, bonus, and career path.  Rachel further noted that prior to the implementation of the flex-time policy, she was forced to take full days to attend to matters related to her miscarriage and IVF, which still negatively affect her growth.

d. Other women at Precipart had similar grievances regarding disparate treatment, some of which were voiced during a focus group.  Walter took adverse action against some of those who made the complaints at the focus group, causing the women to fear retaliation.

e. Pandis told Rachel that it was a shame she was having a child because it would hinder her growth, and also told her that she must have a strong husband to allow her to work while having a family.  Pandis made similar comments to Ferrizz.

f. Field questioned the need for Rachel to be supplied with a tablet based on the fact she was taking maternity leave.  As a result, she never received a tablet and is forced to use her personal cell phone for workshare activities.  This affected her productivity, as she was required to be present in various conference rooms several times each day without access to her work.

g. Following Walter's order that no new female employees be hired, Rudolf admitted to Rachel that HR asked him whether he wanted them to eliminate female employees from the list of prospective hires so that he did not have to deal with another pregnancy.

h. Following the June 14, 2019 breakfast with Laubscher in which numerous complaints were raised by Rachel and other female employees, there appears to have been no meaningful attempt to respond to their concerns.

i. Rachel is aware of other female employees, who are holding off on having a family because they fear it will hinder their growth at Precipart based on their observations of how Precipart has treated Rachel, Ferrizz, and Broadway.

71. On July 23, 2019, Rachel, through counsel, provided Precipart with a draft copy of a New

York State Division of Human Rights complaint that detailed the above-described discrimination.

72. In early August 2019, Ferrizz told Rachel that Walter had chastised her for corroborating the fact he had made comments to the effect that Precipart should not hire more female employees.  Walter told Ferrizz that he felt like she was "one of the boys" and could trust her, implying that he no longer believed Ferrizz was trustworthy.

73. On August 9, 2019, in retaliation for Rachel's complaints, Rudolf removed Rachel from a Collins SIP/SRA review, which was a project she had been assigned to for many months. Thereafter, on August 14, 2019, Rudolf attempted to replace Rachel with a male employee as the lead on a PPAP project.  Although the replacement did not occur due to complaints by the customer, Rudolf subsequently excluded Rachel from numerous meetings and emails related to this project.  Then, on August 15, 2019, Rudolf excluded Rachel from a meeting with management regarding various cost-savings projects.  Upon information and belief, cost-saving measures taken by Rachel were credited to other male employees during this meeting.

74. On August 16, 2019, Rachel met with Pisani, Richard Fox (CFO) and Precipart's in-house counsel, Colin Miller to discuss the results of their investigation and to receive her annual review.[5]

75. Precipart generally denied that discrimination had occurred, but conceded that "totally inappropriate" comments had been made, including comments that Precipart should not

---

[5] All other salaried employees who did not complain about discrimination received their reviews (and accompanying raises/bonuses) in July 2019.

hire more women and that Rachel would not advance in her career due to being a mother. Rachel inquired about the procedure for complaining about subsequent retaliation, and was advised by Precipart's counsel that due to the "litigation stance," it was unclear where Precipart's "obligations with respect to its policy end and its obligations with respect to defending itself begins," and Rachel may need to complain through counsel. Rachel was again penalized in the attendance section of her performance review, and, in the employee comments section of the review, stated, "Please clarify the 3/5 rating for demonstrating good work attendance.  Does receiving a 5 only qualify for employees that do not take allotted sick or vacation time?"

76. On August 20, 2019, Rachel emailed Paisani, noting that although Precipart indicated at the August 16, 2019 meeting that it was not interested in hearing about further complaints about retaliation, Rachel nonetheless wanted to keep her informed.  Rachel noted several instances of retaliation, including those referenced in ¶ 50 of this complaint, as well as other instances generally relating to being excluded from important meetings and communications and other matters.

77. On October 28, 2019, in further retaliation, Rudolf demanded that Rachel correct the layout of various heavy machines, which had previously become the responsibility of another male employee after Rachel was removed from a project following her discrimination complaint.  Rudolf falsely claimed the task was time-sensitive.  The task took several hours, causing Rachel to stay well past normal business hours.  Perrino witnessed Rachel struggling with this task (which involved heavy lifting) and attempted to help her, but was called away by Rudolf and chastised, which was witnessed by Patrick Scott.  The following day Perrino complained to HR that he felt this incident was

retaliatory, but was rebuffed.

78. In late October 2019, Joe Bryant (Director of Manufacturing) expressed dismay to Rachel regarding the way Precipart had handled her complaints of discrimination.  Bryant told Rachel that she deserved better, and that she should consider leaving the company because it was apparent she would not be able to grow her career at Precipart.  Bryant further stated that he was confident that Rachel would eventually find happiness at a company that would treat her fairly.

79. On October 31, 2019, Precipart submitted a position statement to the NYSDHR, wherein Precipart admitted, *inter alia*, that Walter directed his subordinates not to hire any female employees, which occurred during a conversation about another employee's pregnancy, and immediately followed Rachel's inquiries regarding maternity leave.

80. On or about November 5, 2019, Bryant told Rachel that he was in a meeting with Rudolf, Walter, and Pisani, and they had discussed an upcoming project that needed to be managed.  Bryant stated that the project fell within Rachel's job description, and he wanted her to manage it.  This angered Walter, who vehemently refused to assign Rachel to the project.  Bryant told Rachel that he "sensed retaliation."  Rachel told Bryant she had made several complaints about discrimination.  Bryant told Rachel he was sorry, and would have loved for her to manage the project, as she was the most qualified employee to do so.

81. On November 7, 2019, Rachel complained to Bryant that Walter had excluded her from managing a project that falls under her job description, which she believed was in retaliation for her complaints of discrimination.  Bryant promised to speak with Kristin

Harrison (new Global CEO of HR) about Rachel's complaint.  Bryant acknowledged he had witnessed Walter direct his anger at Rachel, lamented the fact Precipart was such a "boys club," and said that he wished there could be some accountability for this type of behavior.  At the end of the meeting, Bryant noticed others were outside his office, and expressed fear that they would be seen together.  Bryant told Rachel to wait in his office after he left, and he would text message her when it was safe for her to leave.  Rachel complied.

82. On November 8, 2019 Gene D'Amico (Manager of Manufacturing) told Rachel that Bryant had filed a complaint with Harrison on her behalf, but that it did not go well and that he was now in trouble.  D'Amico told Rachel that Bryant was afraid to be seen with her, but that he wanted her to know he was sorry and tried his best.  D'Amico also expressed dismay regarding the way Precipart had handled Rachel's complaints, and described her work environment as unhealthy.

83. On January 6, 2020, as a result of the discrimination and retaliation, Rachel left her employment.  Rachel's decision to leave was motivated by the following: (a) Rachel's work conditions had become intolerable based on the numerous instances of retaliation discussed herein and other similar instances; (b) Rachel's complaints that she was not being promoted due to discrimination were met with retaliation as opposed to corrective action, thus indicating promotional decisions would continue to be guided by discrimination and that she would likely never be promoted as a result of such discrimination and her complaints regarding same; (c) Rachel knew that Precipart's hostility to working mothers would invariably limit her ability to be in her children's life, as taking time for child related activities would continue be an issue; (d) Bryant told

Rachel that she would not be able to grow her career at Precipart; and (e) Rachel's work assignments had been altered in a way that made it less likely for her to be promoted, advance her career, challenge herself in a way that would allow her to develop professionally, or allow her to perform tasks that were consistent with her training and experience.

## CLAIMS FOR RELIEF
### (Title VII – Discrimination and Retaliation)

84. As set forth above, Precipart subjected Rachel to adverse actions and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq, on the basis of her gender, pregnancy, pregnancy-related conditions, and her opposition to discriminatory practices.

WHEREFORE, Plaintiff demands judgment against Defendant, for all compensatory, emotional, physical, and punitive damages (where applicable), lost pay, front pay, and any other damages permitted by law.  It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled. Plaintiff demands a trial by jury.

Dated: Carle Place, New York
        October 20, 2020

LEEDS BROWN LAW, P.C.
*Attorneys for Plaintiff*
One Old Country Road, Suite 347
Carle Place, N.Y. 11514

(516) 873-9550

_____/s_____
RICK OSTROVE
BRANDON OKANO